FILED
2022 May-17  AM 10:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

**CITY OF BIRMINGHAM,**

    **Plaintiff,**

**V.**

**TRANE U.S. INC., RICHARD CARSON, DANIEL SHABO, and JOHN DOES 1 – 10**

    **Defendants.**

**CIVIL ACTION NO. 2:22-CV-541-CLM**

---

## AMENDED COMPLAINT
## (JURY TRIAL DEMANDED)

---

Plaintiff, the City of Birmingham, Alabama ("City" or "Plaintiff"), files this Amended Complaint against Defendants, Trane U.S. Inc. ("Trane"), Richard "Rick" Carson ("Carson"), Daniel Shabo, ("Shabo"), and John Does 1 – 10 (collectively, the "Defendants"), and hereby pleads as follows:

### I.  PARTIES

1.     Plaintiff, the City of Birmingham, is a municipal corporation organized and existing under the laws of the State of Alabama.  The City of Birmingham is a mid-sized city with a population of more than 200,000 residents. The City is governed by the Mayor and City Council.  The Mayor is elected by the at-large vote of the residents and citizens of the City.  There are nine members of

the City Council, each elected to represent the citizens and residents of one of the City's nine districts. This lawsuit is filed by authority of the Mayor of the City of Birmingham and with approval of the City Council as the elected representatives of the citizens and residents of the City.

2.      Trane U.S. Inc. is a Delaware corporation doing business in the State of Alabama. Trane has been served and has appeared in this lawsuit.

3.      Richard "Rick" Carson is an individual who, on information and belief, resides and works in Alabama. Carson has been served and has appeared in this lawsuit.

4.      Daniel Shabo is an individual who, on information and belief, has resided and worked in Alabama. Shabo has been served and has appeared in this lawsuit.

5.      Defendants John Does 1 – 10 are persons or entities who may be liable for all or part of the claims or damages set forth in this Complaint, but whose involvement or identity is unknown at this time. These defendants include, without limitation, individuals or entities who received improper payments or benefits in connection with the project at issue in this lawsuit.

## II. JURISDICTION AND VENUE

6.      The Court has personal jurisdiction over the Defendants because the Defendants reside in Alabama and/or committed the acts, omissions, and torts

described in this Complaint in the State of Alabama. Defendants also have systematic and continuous contacts with the State of Alabama.

7.    The Circuit Court of Jefferson County, Alabama, has subject matter jurisdiction over this matter under Alabama Code § 12-11-30 as the amount in controversy exceeds the minimum jurisdictional requirements of this Court. Under Alabama Code §§ 6-3-7 and 6-3-2, venue is proper in the Circuit Court of Jefferson County, Alabama.

8.    The City is filing this amended complaint expressly subject to and without waiving its Motion to Remand (Doc. 13) this case to the Circuit Court of Jefferson County, Alabama, where the lawsuit was originally filed, as this Court does not possess subject matter jurisdiction over this dispute under diversity jurisdiction, federal question jurisdiction, or any other grounds for a federal district court to exercise subject matter jurisdiction. The City is filing this amended complaint within 21 days after service of the defendants' Rule 12(b) motion and, therefore, the City may file it as a matter of course without consent of the other parties and without leave of court. *See* FED. R. CIV. P. 15(a)(1).

### III.  CONDITIONS PRECEDENT

9.    All conditions precedent necessary to maintain this action have been performed or have occurred.

## IV.  CASE OVERVIEW

10.    This case involves a fraudulent scheme orchestrated by Trane and its representatives under the guise of an energy performance contract promising $102 million in guaranteed savings for the City.  The City paid Trane more than $60 million to make what Trane characterized as critical upgrades to City buildings. To secure the multi-million project, however, Trane misrepresented what savings the building upgrades would generate and how the supposedly risk-free project would be measured and guaranteed.

11.    Trane represented to the City that guaranteed savings from the building upgrades would pay for the cost of the project, including financing and maintenance costs that resulted in the project costing more than $100 million. Trane repeatedly assured the City that the project would pay for itself by reducing the City's energy costs and eliminating more than $20 million in maintenance and capital expenses.  Far from delivering on its promise of $102 million in guaranteed savings, however, Trane provided illusory guarantees and piecemeal upgrades that diverted taxpayer funds away from critical infrastructure needs and into Trane's coffers.  Despite Trane representing that it would structure the project as a guaranteed energy performance contract, Trane intentionally omitted true performance guarantees and verified energy savings in the contract itself.  Trane's

"bait-and-switch" scheme left the City with more than $100 million in debt and maintenance costs that far exceed any savings realized from the project.

12.     The City thus has been forced to bring this lawsuit to hold Trane and its representatives accountable for their promises to the citizens of Birmingham and the financial losses they have caused.  The City seeks to recover more than $20 million for project costs that cannot be paid from the "guaranteed" savings promised by Trane.  The City also seeks to recover ongoing maintenance and operating costs incurred due to Trane's failure to provide fully functioning improvements.  All told, the City expects that its savings shortfall and losses from the Trane project will exceed $25 million.

## V.  BACKGROUND

**A.     Trane Makes False Promises to Induce the City to Approve the Project.**

13.     The City's path to the ill-fated project with Trane started several years ago.  In April 2014, Trane submitted a proposal to make improvements to City facilities on a performance contracting basis.   In its proposal—which was submitted by Defendant Rick Carson as the Trane project coordinator—Trane pitched a "self-funding" project that would provide the City with state-of-the-art products and technology and long-term economic savings.  Trane represented that its proposed project would allow the City to save money from decreased utilities and maintenance costs, which would enable the City to fund other key programs

and capital improvements.   In touting its experience under energy performance contracts, Trane claimed that it had delivered more than $200 million in guaranteed energy savings since 1994 and had never failed to achieve its guaranteed savings for any project.

14.   In its proposal, Trane invoked the guaranteed structure of an energy performance contract.   Trane pitched the building improvement project as an energy performance contract to avoid an open public bidding process.   Trane emphasized that its project would be backed by a full guarantee of all savings as required by Alabama law and "if calculated energy savings are less than the guaranteed amount, Trane will pay the difference."   Trane explained that "[s]avings are calculated by comparing actual energy usage after project completion with a baseline," which is determined by examining energy usage in pre-project utility bills.   Trane claimed that "we do real M&V [i.e., measurement and verification] that ensures you are earning the benefits of your energy-savings performance contract."   Trane acknowledged in its proposal that, by law, the project costs cannot exceed the amount of energy and operational savings guaranteed by Trane.   With that proposal, Trane pitched a self-funding project with no financial risk to the City.

15.   In November 2014, relying on Trane's representations regarding a guaranteed energy savings project under which Trane would pay for any shortfalls

in savings to cover the cost of the project, the City authorized Trane to go forward with a technical energy audit as required by Alabama's energy performance contracting statute. The letter agreement authorizing the audit notes that Trane proposed a "cash flow positive" project based on a "self-funding, paid from savings program" financed over a 15-year period.

16.     During the next several months, Trane was given full access to the City's facilities and records, including the City's written authorizations for Trane to obtain all utility bills and energy usage information from the companies providing electricity, gas, and water to the City. Trane purportedly surveyed more than one hundred City facilities and recommended the installation of "energy conservation measures" for each building, including LED lighting, new water faucets and low-flow toilets, building envelope improvements, new transformers and electrical upgrades, updated mechanical and HVAC systems, and new building controls.

17.     After completing the audit, Trane (through Defendants Carson, Shabo, and others) represented to the City in October 2015 that the facility improvements could achieve $65 million in savings at a cost of $47 million to $57 million. As part of the supposed savings, Trane represented that the City would save $4.8 million to $5.5 million in future capital improvements that would be avoided due to upgrades made under the Trane project. Trane told the City that the "total cash

flow over the project term will be positive AND annual cash flow will be positive every year." At that time, Trane recommended that the City choose between a few different project scopes and then seek City Council approval of the project.

18.    Trane and the City continued to discuss the project scope and Trane's proposed contract and financing structure over the next several months. Each time the City raised concerns about the project scope and costs, Trane assured the City that the project would be paid for from guaranteed savings and the City would achieve positive cash flow each year of the proposed 18-year guarantee period.

19.    In March 2016, Trane began to encounter difficulties in creating financial projections to show that guaranteed savings would be able to cover the increasing cost estimates for the project. Trane (through Shabo and Carson) acknowledged that without a $4 million up front payment from the City, the project cost would exceed the guaranteed savings, and thus the project would not qualify as an energy performance contract under Alabama law. To get around that issue, Trane came up with the idea to manipulate the capital cost avoidance "savings" by adding another $4 million to $5 million to the original $5 million amount. Going forward, each time Trane needed additional "savings" to cover financing constraints or increases in estimated project costs, Trane would manipulate the operational savings to arrive at a savings amount that narrowly

exceeded the project cost.  To that end, Trane ultimately increased the original $5 million capital cost avoidance "savings" to more than $13 million.

20.    To justify its manipulation of the operational savings and to induce the City to agree to increasing project costs, Trane (through Shabo and, on information and belief, with approval of Carson) represented to the City in May 2016 that "Operational Savings and Capital Cost Avoidance are REAL cost savings that will occur as a result of energy project implementation."  Trane repeatedly assured the City that, by installing the improvements recommended by Trane, the City would avoid future capital improvements and various outside materials and maintenance costs.  Absent Trane's manipulation of the operational savings calculation, the $100 million project would not have qualified as an energy performance contract, which in turn would have doomed approval of the project.

21.    In August 2016, relying on Trane's promises of more than $100 million in guaranteed savings, the City Council approved entering into a contract with Trane to perform improvements to 119 City facilities.  In doing so, the City relied on Trane's representations that energy and operational savings would pay for the entire cost of the project, and that Trane would pay the City for any shortfall in the guaranteed savings.  The City later discovered in early 2022, however, that Trane manipulated the energy performance contracting structure and provided illusory guarantees to the City in order to secure the contract.  Unknown to the City

at the time of Trane's misrepresentations leading up to the Agreement, Trane had no intention of providing a true guarantee of more than $100 million in savings to cover the cost of the project.

**B.**     **Trane Carries Out a "Bait-and-Switch" Scheme with a Project Structure Based on Illusory Guarantees and Manufactured "Savings."**

22.     In its pitch to the City, Trane and its representatives repeatedly invoked the guaranteed structure of an energy performance contract.   Energy performance contracts are subject to public contracting requirements and are regulated by Alabama statute.   As required by Alabama law, such contracts must guarantee that the savings produced by the project are sufficient to cover the entire cost of the project, including both financing costs and annual measurement and verification costs.   Any shortfall in guaranteed savings must be paid by the contractor on an annual basis over the guaranteed savings period, which cannot exceed the lesser of 20 years or the average useful life of the cost saving measures. This guaranteed savings structure protects the government entity from financial risks while allowing infrastructure projects to be financed using tangible energy and operational savings.   In this case, however, when it came time to execute an agreement, Trane effectuated a "bait-and-switch" that fell short of a true performance contract.

23.     Relying on Trane's assurances that the project would be structured to provide the benefits and protections of a guaranteed energy performance contract,

the City and Trane entered into what was called a PACT Agreement (Performance Agreement for Comfort from Trane), dated July 2016, but signed by the City on August 3, 2016 (the "Agreement").

24.     Under the Agreement, the City engaged Trane to make upgrades to 119 buildings, including City Hall, museums, libraries, administration buildings, and police and fire stations. *See* Agreement at § 1.02.   The work included installing new LED lighting and low-flow toilets and faucets; sealing cracks and openings in the building envelope; installing new transformers and electrical outlets; replacing boilers and chilled water systems; and upgrading HVAC and mechanical systems. *See id*. at Ex. B and Ex. E.

25.     The Agreement required the City to pay Trane $61.3 million to perform the work.  *See* Agreement at § 1.02.  The Agreement also called for the City to pay Trane $525,550 each year (with a 3% annual increase) to measure energy savings produced by the project over an eighteen-year guarantee period. *See id*. and Ex. G.

26.     To fund the City's costs of the project, Trane promised to reduce energy consumption and operational costs at City buildings while guaranteeing a minimum level of savings for the City over the life of the contract.  *See* Agreement at p. 2 and § 1.07.  Specifically, Trane guaranteed that the improvements to City facilities would result in $102 million in savings for the City over an eighteen-year

period.  The guaranteed savings consist of $80 million in energy savings and $22 million in operational savings over the eighteen-year period, broken down as follows:

| Year | Energy Savings | Operational Savings | Total Savings |
|---|---|---|---|
| Installation Period | $2,062,755 | $0 | $2,062,755 |
| 1 | $3,202,251 | $1,217,091 | $4,419,342 |
| 2 | $3,311,651 | $1,231,403 | $4,543,054 |
| 3 | $3,425,046 | $1,246,146 | $4,671,192 |
| 4 | $3,542,590 | $1,261,330 | $4,803,920 |
| 5 | $3,664,441 | $1,276,970 | $4,941,411 |
| 6 | $3,790,764 | $1,136,189 | $4,926,953 |
| 7 | $3,921,730 | $1,148,075 | $5,069,805 |
| 8 | $4,057,519 | $1,160,317 | $5,217,836 |
| 9 | $4,198,314 | $1,172,927 | $5,371,241 |
| 10 | $4,344,310 | $1,185,914 | $5,530,225 |
| 11 | $4,495,708 | $1,199,292 | $5,695,000 |
| 12 | $4,652,715 | $1,213,071 | $5,865,786 |
| 13 | $4,815,550 | $1,227,263 | $6,042,813 |
| 14 | $4,984,438 | $1,241,881 | $6,226,318 |
| 15 | $5,159,614 | $1,256,937 | $6,416,551 |
| 16 | $5,341,323 | $1,272,445 | $6,613,768 |
| 17 | $5,529,820 | $1,288,418 | $6,818,238 |
| 18 | $5,725,369 | $1,304,871 | $7,030,240 |
| **Total** | **$80,225,909** | **$22,040,539** | **$102,266,448** |

*See id.* at Ex. E.

27.    Although the Agreement purports to provide $102 million in guaranteed savings for the City, the performance guarantee structure imposed by Trane consists of certain alleged "savings" that are illusory and not based on reality.  A substantial portion of the purported savings under the contract are phony, assumed amounts that are based on unrealistic operating conditions and benchmarks and are not measured against actual savings realized by the City.

12

28.   The $22 million in alleged operational savings consists of avoided costs for future capital expenditures and maintenance of the old equipment, as shown in the below chart:

| Guarantee Term (Year) | JCI Service Contract | Lighting Operational Savings | HVAC Operational Savings | Capital Cost Avoidance | Water Fixture Operational Savings | Pool Chemical Savings | Total |
|---|---|---|---|---|---|---|---|
| 1 | $112,551 | $116,516 | $45,020 | $740,000 | $18,818 | $184,185 | $1,217,091 |
| 2 | $115,927 | $120,012 | $46,371 | $740,000 | $19,383 | $189,711 | $1,231,403 |
| 3 | $119,405 | $123,612 | $47,762 | $740,000 | $19,964 | $195,402 | $1,246,146 |
| 4 | $122,987 | $127,320 | $49,195 | $740,000 | $20,563 | $201,264 | $1,261,330 |
| 5 | $126,677 | $131,140 | $50,671 | $740,000 | $21,180 | $207,302 | $1,276,970 |
| 6 | $130,477 | $- | $52,191 | $740,000 | $- | $213,521 | $1,136,189 |
| 7 | $134,392 | $- | $53,757 | $740,000 | $- | $219,927 | $1,148,075 |
| 8 | $138,423 | $- | $55,369 | $740,000 | $- | $226,524 | $1,160,317 |
| 9 | $142,576 | $- | $57,030 | $740,000 | $- | $233,320 | $1,172,927 |
| 10 | $146,853 | $- | $58,741 | $740,000 | $- | $240,320 | $1,185,914 |
| 11 | $151,259 | $- | $60,504 | $740,000 | $- | $247,529 | $1,199,292 |
| 12 | $155,797 | $- | $62,319 | $740,000 | $- | $254,955 | $1,213,071 |
| 13 | $160,471 | $- | $64,188 | $740,000 | $- | $262,604 | $1,227,263 |
| 14 | $165,285 | $- | $66,114 | $740,000 | $- | $270,482 | $1,241,881 |
| 15 | $170,243 | $- | $68,097 | $740,000 | $- | $278,596 | $1,256,937 |
| 16 | $175,351 | $- | $70,140 | $740,000 | $- | $286,954 | $1,272,445 |
| 17 | $180,611 | $- | $72,244 | $740,000 | $- | $295,563 | $1,288,418 |
| 18 | $186,029 | $- | $74,412 | $740,000 | $- | $304,430 | $1,304,871 |
| Total | | | | $ | | | $ 22,040,539 |

*See id*. at Ex. E.8.  However, the operational savings are assumed amounts that are characterized in the Agreement as "stipulated" and are not subject to any measurement or verification over the eighteen-year guarantee period.   These assumed amounts do not ensure that the City is in fact achieving guaranteed savings as necessary to cover the costs of the Trane project.

29.   For example, the City expects that the $4.3 million in assumed pool chemical savings cannot be achieved due to problems with the associated improvements to City pools.   And as explained above, Trane manipulated the capital cost avoidance calculation to inflate the guaranteed savings amount to

satisfy the statutory requirements on paper.  In reality, the $13.32 million in capital cost avoidance savings are nothing more than the City paying Trane $13.32 million to replace aging equipment that Trane claims the City would need to replace at the same cost if the Trane project was not approved.  By representing to the City that the operational savings as "REAL cost savings that will occur as a result of" Trane's project, Trane induced the City to agree to a deal structure based in part on the theory that City is *saving* $13 million in equipment replacement costs by paying Trane $13 million to replace that very same equipment.

30.    Similarly, the $80 million in energy savings promised under the Agreement are based largely on formulas created and monitored by Trane and its representatives, including but not limited to Carson and Shabo, rather than the measurement and evaluation of the City's actual utility costs.   For most of the alleged energy savings, performance measurement analyzes the operating efficiency of equipment, rather than actual energy usage or utility costs associated with the equipment.   Trane's measurement formula also is based on assumed operating conditions and other factors that do not reflect reality when Trane's performance is measured over the eighteen-year guarantee period.  Similar to the alleged operational savings, the energy savings promised by Trane do not guarantee that the City will realize sufficient savings to cover the cost of the project.

31.     Compounding the illusory nature of Trane's performance guarantees, Trane is charging the City another $12 million to measure its own yearly performance during the guarantee period.   In other words, after receiving $61.3 million in up-front payments from the City, Trane is charging the City millions of dollars more for a self-evaluation of its performance metrics that do not reflect the City's actual realized savings.

32.     In short, despite presenting its project as a guaranteed energy performance contract, Trane created a contract structure that fails to deliver the guaranteed savings promised by Trane and required by law for such contracts. Knowing the City lacked the technical expertise to fully evaluate Trane's proposal, Trane was able to effectuate a "bait-and-switch" that fell short of a true energy performance contract with guaranteed savings that would pay for the cost of the entire project.   The City thus took on all of the risk of the project while Trane was paid $61.3 million regardless of its delivery of actual savings.   In the end, the energy performance contract promised by Trane was not an energy performance contract at all.

33.     Trane's "bait-and-switch" scheme is not only fraudulent, but it also invalidates the contract, which lacks the statutory protections promised by Trane and to which the City and its citizens are entitled.   Trane sold the building improvement project as an energy performance contract to avoid an open public

bidding process.  But the process used by Trane was a sham.  Because of Trane's manipulations, the project was not publicly bid and the contract is devoid of the guarantees and protections required by Alabama law.  By promising but failing to provide an actual energy performance contract with guaranteed savings, Trane violated the strict bidding requirements of Alabama's public bidding statute and created an invalid contract that undermines the very purpose of guaranteed energy performance contracts.   In other words, Trane used the energy performance contracting structure to intentionally avoid public bidding of the project and defrauded the City and its residents by failing to deliver a true energy performance contact.

**C.    Trane Provides Piecemeal Upgrades that Fail to Address City Facility Needs and Undercut Savings from the Project.**

34.    Trane and its representatives not only defrauded the City through the contracting process, Trane also failed to provide reliable and comprehensive upgrades to address the needs of the City facilities.  During implementation of the project, the City realized that the upgrades contemplated by Trane were not based on an accurate and complete understanding of the City's infrastructure and needs. Instead, Trane created a conceptual scope of work that failed to address actual challenges in the field and the overall infrastructure.

35.    For example, Trane recommended installing an above ground water capture system at the Botanical Gardens, which Trane promised would provide

monetary savings to the City through decreased water usage.  However, Trane failed to perform the due diligence necessary to understand that connecting such a system to existing water lines would be problematic, if not impossible.  As an alternative to the above ground capture system, Trane recommended and installed a water well, but the City has encountered similar problems with connecting the well to existing lines.  Trane simply failed to perform the due diligence that would have revealed the connectivity issues with the water lines.  This alleged savings measure thus has not generated the savings that Trane promised.

36.     Similarly, Trane promised water savings based on the replacement of flush valves and toilets in several buildings.  However, the new low flow toilets and flush valves are connected to old water pipes, which has created functionality problems associated with the water pressure.  In fact, at least one toilet at a public facility (Legion Field) exploded due to this issue.  As a purported expert, Trane should have performed adequate due diligence and informed the City of potential problems associated with connecting new flush valves and toilets to old plumbing lines.

37.     Trane also promised savings associated with converting the City's pools from chlorine to saltwater.  However, Trane fails to account for how the saltwater would impact the existing infrastructure of the pools and the additional cost of servicing the pools after the conversion.  After incurring substantial costs to

convert the pools, the City has been burdened with the costs of repairing corrosion and other damage to the pools resulting from the saltwater conversion. Again, Trane should have performed the due diligence necessary to address these issues and advise the City of problems associated with the proposed work.

38.     In addition to other day-to-day problems arising from Trane's work, the City has experienced significant challenges with temperature control settings at City buildings following the Trane project. For many City buildings, the building control system installed by Trane controls the temperature settings and other operating parameters for the mechanical and HVAC systems. The temperature set by Trane is often inappropriate for the building use and number of persons occupying a building, including for event venues. The City cannot control the thermostat in these situations and is required to contact Trane to adjust the temperature settings, with City workers and guests suffering through unbearable temperature conditions while at the mercy of Trane's adjustments. While purporting to save the City on energy costs, Trane has in many cases simply manipulated the calculation by imposing unrealistic operating conditions and taking away the City's ability to control the indoor temperature of its own buildings.

39.   As a result of Trane's piecemeal upgrades, unrealistic temperature settings, and poor-quality workmanship, the City has been forced to cancel,

postpone, and/or cut short events such as community and town hall events, youth sports games, and other such planned activities.  The City even had to shut down its well-known Boutwell Auditorium homeless warming station on some of the coldest days of the year because of Trane's failure to provide and maintain working boilers in the building.

**D.    Trane Conceals Its Fraud and the Savings Shortfall While Continuing to Mislead the City After Completion of the Project.**

40.    During the implementation phase of the Trane Project, from 2016-2019, while Trane was installing the building upgrades, Trane and its representatives—including but not limited to Richard Carson, Dan Shabo, and others—would provide interim progress reports to the City that purported to show some interim savings during the implementation phase.  After completion of the building upgrades in early 2019 and up until the filing of this lawsuit in March 2022, Trane and its representatives—including but not limited to, Richard Carson, Dan Shabo, and others—continued to make misrepresentations to the City and conceal the savings shortfall from the City through official annual reports.  In doing so, Trane misrepresented the nature and magnitude of the purported savings generated by the project in order to conceal Trane's fraud and to convince the City to continue paying Trane millions of dollars over the eighteen-year guarantee period despite Trane's failure to deliver sufficient savings to cover the cost of the project.

41.     Under the Agreement, Trane and its representatives agreed to provide annual reports to the City showing the measured and verified savings for each year of the eighteen-year guarantee period.  The first official and complete annual report was provided to the City in July 2020 and covered the first-year savings period from April 1, 2019 through March 31, 2020.  The second annual report was provided to the City in June 2021 and covered the second-year savings period from April 1, 2020 through March 31, 2021.

42.     In Trane's reports to the City after project completion provided by and under the direction of Carson, Shabo, and others, including in oral presentations and in the written annual reports in July 2020 and June 2021, Trane misrepresented the savings generated by the project and concealed the fact that there was in reality a savings shortfall when comparing the City's actual costs to Trane's black-box calculations.  In the Year 1 Report presented to the City in July 2020, Trane represented that the annual monetary savings generated by the Trane project for the first measurement year was $3.23 million, narrowly exceeding the $3.2 million required to cover the City's annual project costs.  Trane told the City that it expected similar savings in future years and, in the Year 2 Report presented to the City in June 2021, Trane again represented that the annual monetary savings generated by the project for the second measurement year was $3.35 million, exceeding the $3.31 million needed to cover the City's project costs for that year.

In short, Trane told the City in its annual reports in July 2020 and June 2021 that the annual savings from the project exceeded the City's annual costs of the project and would continue to do so through the eighteen-year guarantee period.  In reality, however, the savings generated from the project have not been able to cover project cost.

43.    The City did not discover the savings shortfall and Trane's fraudulent scheme until after the first official annual report was provided to the City in July 2020.  When Trane represented in July 2020 that the annual savings requirement had been satisfied for Year 1 of the guarantee period, the City questioned the calculation given the problems it had encountered with the project.  For example, as explained above, Trane had created a conceptual scope of work that failed to address actual challenges in the field and the overall infrastructure, which resulted in deficiencies in items such as the pool upgrades and water measures applicable to facilities such as the Botanical Gardens.  Yet Trane told the City in July 2020 that the annual monetary savings generated by the project had exceeded the savings requirements, resulting in positive annual cash flow for the City that was sufficient to cover the annual project cost.

44.    Given the problems encountered with various items of the project, the City began an investigation after receiving Trane's first annual report in July 2020 claiming that Trane's project had exceeded the annual savings requirement.

During a preliminary analysis of Trane's first annual report over the next several months, the City discovered in November 2020 at the earliest that the City may have experienced savings shortfalls contrary to Trane's representations.  As a result, the City expanded its investigation to further evaluate Trane's calculation of purported savings by comparing Trane's representations to the City's actual costs, which involved obtaining utility billing data from outside parties and comparing the third-party data to Trane's representations of annual savings as set forth in the Year 1 Report.  As part of the expanded investigation, the City also evaluated Trane's Year 2 report provided in June 2021 and Trane's representations of purported savings as contained in that report.

45.    The City ultimately completed its investigation in February 2022 and discovered that the project had fallen short of the annual savings promised by Trane and that the building improvements would never be able to achieve sufficient savings to cover the cost of the project.  At that time in February 2022, the City discovered the savings shortfall that had been concealed by Trane in reports to the City (provided by and under the direction of Carson and Shabo) since project completion in early 2019.  The City learned at that time that Trane had defrauded the City by misrepresenting that guaranteed savings from the Trane project would pay for the cost of the project and would deliver sufficient savings to cover the City's annual project costs for the entire eighteen-year guaranteed period.

The City also discovered at that time in February 2022 that Trane had concealed the City's savings shortfall and monetary damages, as well as Trane's fraud in inducing the City to enter into the Agreement, by misrepresenting the nature and magnitude of the purported savings in reports to the City in July 2020, June 2021, and in subsequent reports to the City up until this lawsuit was filed in March 2022.

46.     Simply put, Trane made misrepresentations to the City to induce the City to enter into the Agreement, and Trane continued to make misrepresentations to the City after project completion in 2019 and up until this lawsuit was filed in March 2022.  Trane misrepresented the purported savings after project completion in order to conceal Trane's fraud and the City's savings shortfall, while also inducing the City to continue paying Trane more than $500,000 each year for Trane to measure its own performance of illusory guarantees.  Trane's continuing fraud over a period of more than eight years was intended to conceal Trane's false promises and the City's damages from the Trane project, which Trane succeeded in doing until early 2022.

**E.     The City's Savings Shortfall and Damages from the Trane Project Are Estimated to Exceed $25 Million.**

47.     Despite the City committing more than $100 million to update City facilities based on Trane's recommendation as an expert in the field, the project has fallen well short of the $102 million in savings promised by Trane.  In fact, contrary to Alabama law and Trane's representations, the building improvements

will never be able to achieve sufficient savings to cover the cost of the project, even if the improvements work as intended and the buildings are operated as efficiently as possible.

48.     At this time, preliminary calculations place the savings shortfall from the Trane project at more than $1 million per year over the life of the eighteen-year contract.  In addition to the savings shortfall, the City has incurred ongoing costs to operate and maintain the City facilities due to incomplete and faulty improvements made by Trane.  In total, the City expects that its damages from the Trane project will exceed $25 million.

## VI.  CAUSES OF ACTION

### Count One – Fraud and Fraud in the Inducement

49.     Plaintiff incorporates all prior paragraphs into this section, to the extent not inconsistent, as if fully set forth herein.

50.     During discussions before execution of the Agreement and in meetings and presentations seeking to obtain the City's approval of the project proposed by Trane, Trane—through its representatives, including but not limited to, Carson and Shabo (including in Trane's proposal submitted to the City in April 2014, and in emails and presentation materials sent to the City in October 2015, March 2016, and May 2016)—misrepresented to the City that: (a) guaranteed savings from the improvements to City buildings recommended by Trane will pay

for the cost of the entire project, including the City's payment of $61.3 million to Trane and the City's financing and annual maintenance costs bringing the total cost of the project to more than $100 million; (b) the total cash flow over the project term will be positive and annual cash flow from the project will be positive every year during the repayment term; (c) the project will be backed by Trane's full guarantee of all savings and if the savings are less than the guaranteed amount, Trane will pay the difference to the City; (d) the operational savings and capital cost avoidance savings proposed by Trane are REAL cost savings that will occur as a result of implementation of the Trane project; and (e) the project would be guaranteed under the protections and requirements of an energy performance contract as part of Trane's scheme to avoid public bidding of the project.  These false promises and misrepresentations were made in oral and written statements to various representatives of the City—including City Council members and City employees Sherri Nielson, Eric Fancher, and Thomas Barnett—throughout 2014, 2015, and 2016.

51.    Between project completion in early 2019 and the filing of this lawsuit in March 2022, Trane—by and under the direction of Trane representatives, including but not limited to, Carson and Shabo—continued to misrepresent to the City that:  (a) the Trane project has generated annual monetary savings that exceeded the City's annual cost of the project for each year of the

project, (b) the City's annual cash flow from the Trane project has been positive every year of the repayment term and has covered the City's annual costs, including debt repayments and annual measurement and verification costs, and (c) the City has achieved real operational savings and capital cost avoidance savings in the total amount promised by Trane for each year of the project.  These false promises and misrepresentations were made in oral and written statements to various representatives of the City, including in reports provided by Trane to City officials such as Terry Oglesby and others in July 2020 and June 2021.

52.    The above referenced statements, misrepresentations, and deceptive conduct were made by Trane, Carson, and Shabo with actual knowledge that they were false.  Alternatively, the above referenced statements, misrepresentations, and deceptive conduct were made recklessly, as a positive assertion, and without knowledge of their truth.

53.    The above referenced statements, misrepresentations, and deceptive conduct were material to the City's decision to enter into the Agreement, to authorize Trane to make improvements to the City's facilities, and to continue to pay Trane for its work on the project.  Trane, Carson, and Shabo made the above referenced statements, misrepresentations, and deceptive conduct with the intention that the City act upon them and enter into the Agreement, and the City relied on the above referenced statements and misrepresentations in entering into

the Agreement, in authorizing Trane to make improvements to the City's facilities, and in continuing to pay Trane over the course of the project. From its initial proposal through completion of the project and post-completion measurement and verification of the project, Trane represented to the City that Trane was an expert in many different areas, including energy savings performance contracting, financing strategies, construction management, construction design/build process, emerging technologies, energy planning, utility bill analysis, and water conservation. The City relied on Trane's representations of its expertise in following Trane's recommendations, in relying on Trane's representations regarding the project and the City's infrastructure and facility needs, and in relying on Trane's representations regarding its measurement and verification of purported savings and project performance after completion of the project.

54.    By virtue of the above referenced statements, misrepresentations, and deceptive conduct, Trane, Carson, and Shabo also concealed or failed to disclose material facts that they had a duty to disclose to the City, which induced the City to enter into the Agreement, to authorize Trane to make improvements to the City's facilities, and to continue to pay Trane for its work on the project.

55.    As a result of Trane's, Carson's, and Shabo's false representations and deceptive conduct, the City has incurred damages for which it now sues. The City requests that Trane, Carson, and Shabo be held jointly and severally liable and be

ordered to disgorge all revenue and funds received from the City and pay all actual and consequential damages resulting from their wrongful conduct, including but not limited to the City's savings shortfall from the project; the City's lost revenue and budgetary shortfalls; and the City's investigation, remediation, repair and maintenance costs.   The City also seeks punitive damages due to Trane's, Carson's, and Shabo's fraud.

### Count Two – Negligent Misrepresentation

56.     Pleading affirmatively and in the alternative, Plaintiff incorporates all prior paragraphs into this section, to the extent not inconsistent, as if fully set forth herein.

57.     Trane—through Carson and Shabo—misrepresented to the City that: (a) guaranteed savings from the improvements to City buildings recommended by Trane will pay for the cost of the entire project, including the City's payment of $61.3 million to Trane and the City's financing and annual maintenance costs bringing the total cost of the project to more than $100 million; (b) the total cash flow over the project term will be positive and annual cash flow from the project will be positive every year during the repayment term; (c) the project will be backed by Trane's full guarantee of all savings and if the savings are less than the guaranteed amount, Trane will pay the difference to the City; (d) the operational savings and capital cost avoidance savings proposed by Trane are REAL cost

savings that will occur as a result of implementation of the Trane project; and (e) the project would be guaranteed under the protections and requirements of an energy performance contract as part of Trane's scheme to avoid public bidding of the project.  These false representations were made in oral and written statements to various representatives of the City—including City Council members and City employees Sherri Nielson, Eric Fancher, and Thomas Barnett—throughout 2014, 2015, and 2016.

58.    Between project completion in early 2019 and the filing of this lawsuit in March 2022, Trane and its representatives—including, but not limited to, Carson and Shabo—also misrepresented to the City that:  (a) the Trane project has generated annual monetary savings that exceeded the City's annual cost of the project for each year of the project, (b) the City's annual cash flow from the Trane project has been positive every year of the repayment term and has covered the City's annual costs, including debt repayments and annual measurement and verification costs, and (c) the City has achieved real operational savings and capital cost avoidance savings in the total amount promised by Trane for each year of the project.  These false promises and misrepresentations were made in oral and written statements to various representatives of the City, including in reports provided by Trane to City officials, such as Terry Oglesby and others in July 2020 and June 2021.

59.    Trane, Carson, and Shabo failed to exercise reasonable care in making the above referenced statements and misrepresentations.

60.    The above referenced statements and misrepresentations were material to the City's decision to enter into the Agreement, to authorize Trane to make improvements to the City's facilities, and to continue to pay Trane for its work on the project.   The City relied on the above referenced statements and misrepresentations in entering into the Agreement, in authorizing Trane to make improvements to the City's facilities, and in continuing to pay Trane over the course of the project.

61.    As a result of Trane's, Carson's, and Shabo's misrepresentations, the City has incurred damages for which it now sues.   The City requests that Trane, Carson, and Shabo be held jointly and severally liable and be ordered to disgorge all revenue and funds received from the City and pay all actual and consequential damages resulting from their wrongful conduct, including but not limited to the City's savings shortfall from the project; the City's lost revenue and budgetary shortfalls; and the City's investigation, remediation, repair and maintenance costs. The City also seeks punitive damages because Trane's, Carson's, and Shabo's misrepresentations constitute gross negligence.

## Count Three – Negligence

62.     Pleading affirmatively and in the alternative, Plaintiff incorporates all prior paragraphs into this section, to the extent not inconsistent, as if fully set forth herein.

63.     Trane owed legal duties to the City in connection with the design and installation of the various equipment, systems, and other improvements installed by Trane at City facilities.  Trane breached its duties and obligations to the City by failing to provide adequate design, services, management, and oversight, and by failing to furnish and install equipment and systems that were free of defects in design, work, and materials and that worked correctly with regard to both the physical equipment and overall system design.

64.     Trane breached its duties owed to the City by, among other reasons: (a) failing to adequately design the facility improvements to ensure the proper installation of equipment and the correct functioning of the overall systems; (b) failing to adequately design the facility improvements and systems to ensure that they were appropriate for the City's resources and infrastructure and could be managed and operated by the City's personnel; (c) failing to responsibly and properly represent the City during installation of the facility improvements by using Trane's professional skill and supervision; (d) failing to guard against defects and deficiencies in the work in a manner consistent with Trane's standard of care;

(e) failing to determine in general if the work, when fully completed, would be in accordance with applicable codes, regulations, and industry standards; (f) failing to use ordinary care, skill, and judgment in the installation of the facility improvements and equipment; (g) failing to use ordinary care, skill, and judgment in the selection of tradesman and subcontractors for installation of the facility improvements and equipment; and (h) failing to use ordinary care, skill, and judgment in inspecting the products and work for the project.

65.     Trane's breaches of its duties and standards of care proximately caused injury to the City, resulting in damages to the City, including but not limited to investigation and remediation costs, repair costs, loss of use, lost revenue, lost efficiency, and other actual and consequential damages.  The City also seeks punitive damages as the Defendants' conduct rises to the level of gross negligence.

**Count Four – Breach of Implied Warranty of Good Workmanship**

66.     Pleading affirmatively and in the alternative, Plaintiff incorporates all prior paragraphs into this section, to the extent not inconsistent, as if fully set forth herein.

67.     Trane impliedly warranted that it was a careful and competent manager and contractor, and that it would provide construction services and project management in a good and workmanlike manner.  Trane did not provide such

services in a good and workmanlike manner because equipment and systems installed by Trane are flawed and deficient.

68.    The City relied on Trane's implied warranties.  Trane's breach of implied warranties directly and proximately caused injury to the City, resulting in damages to the City, including investigation and remediation costs, repair costs, increased operations and maintenance costs, lost efficiency, and other actual and consequential damages.

### Count Five – Unjust Enrichment

69.    Pleading affirmatively and in the alternative, Plaintiff incorporates all prior paragraphs into this section, to the extent not inconsistent, as if fully set forth herein.

70.    The Defendants have unjustly enriched themselves, to the City's detriment, by the acts, omissions, and torts described in this Complaint.

71.    The City paid Trane more than $60 million for updates to City buildings that are flawed and deficient as described in this Complaint, and the project was awarded to Trane based on the Defendants' fraudulent misrepresentations.

72.    The Defendants' retention of the City's funds is unconscionable, and such funds belong to the City in equity and good conscience.  The City requests that the Defendants be ordered to provide full restitution, disgorge all revenue and

wrongfully-obtained funds, and pay all actual and consequential damages resulting from their wrongful conduct and retention of funds which in good conscience and equity belong to the City.

## Count Six – Declaratory Judgment

73.     Pleading in the alternative, Plaintiff incorporates all prior paragraphs into this section, to the extent not inconsistent, as if fully set forth herein.

74.     To the extent that the Agreement is enforced despite Trane's fraud, the City seeks a declaration to clarify its rights and obligations and determine the validity and enforceability of certain aspects of the Agreement.

75.     Specifically, the City seeks a declaration from the Court that the provisions of the Agreement related to guaranteed savings and the measurement and verification of such savings under Section 1.07 and Exhibit E to the Agreement (including the "Energy Savings" and "Operational Savings" set forth in Exhibit E) and the "Guarantee" (as that term is defined in the Agreement), including Section 3.04 purporting to limit Trane's liability related to the Guarantee and Sections 6.02 and 7.02 purporting to broadly limit Trane's liability, are invalid and unenforceable as written and as applied because the provisions fail to comply with Alabama law governing energy performance contracting and energy cost savings contracts, including Alabama Code §§ 41-16-140 through 41-16-144.  To constitute a valid energy performance contract under Alabama law, the Agreement

must provide a written guarantee of actual monetary savings that will be realized by the City and will meet or exceed the costs of all cost savings measures performed under the Agreement—including the City's financing costs and annual measurement and verification costs—and any shortfall in guaranteed savings must be paid by Trane on an annual basis over the guaranteed savings period. Trane's illusory guarantees regarding savings and the limitations on the measurement of savings in the Agreement render those provisions of the Agreement invalid and unenforceable under Alabama law. The City seeks a declaration from the Court that Trane thus is liable, as required by Alabama law and public policy, to reimburse the City for all shortfalls in the $102 million in promised savings for each year of the installation period and the eighteen-year guarantee period under which savings must cover the project costs.

### Count Seven – Breach of Contract

76. Pleading in the alternative, Plaintiff incorporates all prior paragraphs into this section, to the extent not inconsistent, as if fully set forth herein.

77. To the extent that the Agreement is enforced as written despite Trane's fraud and failure to comply with applicable Alabama law governing energy performance contracts as described in this Complaint, the City asserts in the alternative that the Agreement constitutes a valid, binding, and enforceable

contract between Trane and the City, and the City has performed its obligations under the Agreement.

78.     Trane breached the Agreement by, among other reasons, (a) failing to properly and adequately design and install the facility improvements to ensure the correct functioning of the equipment and the overall facility systems; (b) failing to properly and adequately design and install the facility improvements and systems to ensure that they were appropriate for the City's resources and infrastructure and could be efficiently managed and operated by the City's personnel; (c) failing to properly and adequately design and install the facility improvements to ensure that the City would achieve sufficient savings to cover the costs of the project; and (d) failing to conduct all work in a workmanlike manner.

79.     As a result of Trane's breach of its contractual duties, the City has incurred money damages for which it now sues.

**Count Eight – Breach of Covenant of Good Faith and Fair Dealing**

80.     Pleading in the alternative, Plaintiff incorporates all prior paragraphs into this section, to the extent not inconsistent, as if fully set forth herein.

81.     To the extent the Agreement is enforced as written despite Trane's fraud and failure to comply with applicable Alabama law governing energy performance contracts as described in this Complaint, Trane owed and continues to owe the City a duty of good faith and fair dealing in connection with the

Agreement.  As described in this Complaint, Trane breached such duty by (a) failing to properly and adequately design and install the facility improvements to ensure the correct functioning of the equipment and the overall facility systems; (b) failing to properly and adequately design and install the facility improvements and systems to ensure that they were appropriate for the City's resources and infrastructure and could be efficiently managed and operated by the City's personnel; (c) failing to properly and adequately design and install the facility improvements to ensure that the City would achieve sufficient savings to cover the costs of the project; and (d) failing to conduct all work in a workmanlike manner. In accordance with reason and justice and in order to carry out the purpose of the Agreement, the City requests that Trane be compelled to pay the City for shortfalls in monetary savings sufficient to cover all costs of the Trane project, as promised under the Agreement and as required by Alabama law and public policy.

82.    As a result of Trane's breach of its duty of good faith and fair dealing, the City has incurred money damages for which it now sues.  The City requests that Trane be ordered to disgorge all profits and wrongfully-obtained funds, and pay all actual and consequential damages, resulting from Trane's breach of its duty of good faith and fair dealing.  The City also requests punitive damages.

## VII.  DAMAGES

83.    At this time, the City seeks to recover more than $25 million in actual and consequential damages.  The damages sought by the City include more than $20 million for the City's costs of funding the Trane project that cannot be satisfied by savings generated by the project. In addition to the savings shortfall, the City seeks damages for the ongoing costs to operate and maintain the City facilities due to incomplete and faulty improvements made by Trane.  The monetary damages sought by the City may increase as the City continues to investigate the scope of the City's injuries caused by the Defendants' conduct.

84.    The City also seeks punitive and exemplary damages due to the Defendants' fraud, malice, gross negligence, reckless conduct, and disregard of the City's rights as set forth in this Complaint.  The City further seeks an award of its costs and attorneys' fees.

## VIII.  FRAUDULENT CONCEALMENT & TOLLING OF LIMITATIONS PERIOD

85.    As alleged above, despite exercising reasonable care, the City did not discover the Defendants' fraud or the City's damages arising from the Trane project until February 2022.

86.    After completion of the building upgrades in early 2019 and up until the filing of this lawsuit in March 2022, Trane (by and under the direction of Trane representatives Carson and Shabo) continued to make misrepresentations to the

City and conceal the savings shortfall from the City.   In doing so, Trane misrepresented the nature and magnitude of the purported savings generated by the project in order to conceal Trane's fraud and to convince the City to continue paying Trane millions of dollars over the eighteen-year guarantee period.

87.   The City did not discover the savings shortfall and Trane's fraudulent scheme until after the first annual report was provided to the City in July 2020. Given the problems encountered with various items of the project—including deficiencies in the pool upgrades and water measures applicable to facilities such as the Botanical Gardens—the City began an investigation after receiving Trane's first annual report in July 2020 claiming that Trane's project had exceeded the annual savings requirement.   The City's investigation included an evaluation of Trane's calculation of Year 1 annual savings by comparing Trane's representations in its annual report to the City's actual costs, which involved obtaining utility billing data from outside parties and comparing the third-party data to Trane's representations of annual savings as set forth in the Year 1 Report.   The City also evaluated Trane's Year 2 report provided in June 2021 and Trane's representations of purported savings as contained in that report.

88.   The City ultimately completed its investigation in February 2022 and discovered that the project had fallen short of the annual savings promised by Trane, and that the building improvements would never be able to achieve

sufficient savings to cover the cost of the project.  At the time of completion of the City's investigation in February 2022, the City discovered the savings shortfall that had been concealed by Trane in reports to the City since project completion in early 2019.  The City learned at that time that Trane had defrauded the City by misrepresenting that guaranteed savings from the Trane project would pay for the cost of the project and would deliver sufficient savings to cover the City's annual project costs for the entire eighteen-year guaranteed period.  The City also discovered at that time in February 2022 that Trane had concealed the City's savings shortfall and monetary damages, as well as Trane's fraud in inducing the City to enter into the Agreement, by misrepresenting the nature and magnitude of the purported savings in reports to the City in July 2020, June 2021, and in subsequent reports to the City up until this lawsuit was filed in March 2022.

89.    Before Trane presented its Year 1 report in July 2020 and the City subsequently compared third-party utility data to Trane's report, the City could not have discovered the savings shortfall and Trane's fraud and misrepresentations associated with the savings promised by Trane and required by Alabama law.  This is because, in part, even though the Trane PACT Agreement was signed in 2016, the construction and implementation of the project took three years from 2016-2019; thus, during that interim time period, there was no way to meaningfully and completely measure and verify whether the representations made by Trane during

the inception and signing of the Agreement in 2016 were truthful or accurate. Trane's continued misrepresentations in its annual reports from 2020 – 2022 regarding purported savings after completion of the project in early 2019 were intended to—and did in fact succeed in—concealing the City's damages from the savings shortfall and Trane's fraud and misrepresentations both before and after execution of the Agreement.

90.     The Defendants thus are estopped and precluded from asserting that the City's claims are time-barred or invoking the two-year statute of limitations and any other limitations period as a bar to any of the City's claims, including under Alabama Code § 6-2-3.

## IX.  JURY DEMAND

91.     The City demands a trial by jury.

## X.  PRAYER

The City prays that Defendants Trane U.S. Inc., Richard "Rick" Carson, and Daniel Shabo be cited to appear and answer herein, and that the City be awarded the following relief:

    (a)     all actual and consequential damages resulting from Trane's breach of contract and the Defendants' tortious conduct in an amount to be proved at trial, including but not limited to the costs paid or incurred by the City in connection with the Agreement and the Trane project, savings shortfalls under the Agreement and the Trane project, debt service costs, lost profits, lost revenue, repair and maintenance costs, loss of use, business interruption losses, restitution of Defendants'

wrongfully-obtained gains, and reimbursement for funds or property which in equity and good conscience belong to the City;

(b)     pre-judgment and post-judgment interest;

(c)     costs and attorney's fees;

(d)     punitive damages; and

(e)     such other and further relief, in equity or in law, to which the City may show itself justly entitled.

Respectfully submitted,


/s/ R. Ashby Pate
John M. Johnson JOH019
*jjohnson@lightfootlaw.com*
R. Ashby Pate PAT077
*apate@lightfootlaw.com*
Elizabeth L. Huntley HUN025
*ehuntley@lightfootlaw.com*
Lightfoot, Franklin & White LLC
The Clark Building
400 20th Street North
Birmingham, Alabama 35203
Telephone: (205) 581-0700
Facsimile: (205) 581-0799

Brian C. Boyle (*seeking admission pro hac vice*)
Texas Bar No. 24045543
*bboyle@lightfootlaw.com*
Lightfoot, Franklin & White LLC
1885 Saint James Place, Suite 1150
Houston, Texas 77056
Telephone: (713) 960-1488
Facsimile: (713) 960-8991

ATTORNEYS FOR PLAINTIFF,
THE CITY OF BIRMINGHAM, ALABAMA

## CERTIFICATE OF SERVICE

I certify that on <u>May 17 , 2022,</u> I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send electronic notification of such filing to the parties.  If CM/ECF indicates that Notice needs to be delivered by other means to any of the following, I certify that a copy will be sent via U.S. Mail, properly addressed, postage prepaid.

Matthew H. Lembke
Stanley E. Blackmon
Riley A. McDaniel
BRADLEY ARANT BOULT CUMMINGS LLP
1819 Fifth Avenue North
Birmingham, AL 35203
(205)521-8000
Facsimile: (205)521-8800
*mlembke@bradley.com*
*sblackmon@bradley.com*
*rmcdaniel@bradley.com*

Steven R. Lindemann (pro hac vice forthcoming)
Benjamin D. Eastburn (pro hac vice forthcoming)
STINSON LLP
50 South Sixth Street
Suite 2600
Minneapolis, MN 55402
(612) 335-1724
*steve.lindemann@stinson.com*
*benjamin.eastburn@stinson.com*

Luke VanFleteren
STINSON LLP
1625 N. Waterfront Parkway
Suite 300
Wichita, KS 67206
(316) 265-8800
*luke.vanfleteren@stinson.com*
                    Attorneys for Defendant Trane U.S. Inc.

Jonathan B. Head
Ethan A. Wilkinson
Weinberg, Wheeler, Hudgins, Gunn & Dial, LLC
100 Corporate Parkway, One Lake Level
Birmingham, Alabama 35242
Phone: (205) 572-4100
Fax: (205) 572-4199
*jhead@wwhgd.com*
*ewilkinson@wwhgd.com*

David A. Dial
3344 Peachtree Road NE, Suite 2400
Atlanta, Georgia 30326
Phone: (404) 876-2700
Fax: (404) 875-9433
*ddial@wwhgd.com*
        Attorneys for Daniel Shabo

Brannon J. Buck
Christopher B. Driver
BADHAM & BUCK LLC
2001 Park Place North
Suite 500
Birmingham, AL 35203
205-521-0036
205-521-0037 (fax)
*bbuck@badhambuck.com*
*cdriver@badhambuck.com*
        Attorneys for Richard "Rick" Carson

/s/ R. Ashby Pate
OF COUNSEL